IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

REDUS REDMOND OR LAND, LLC,           )
                                      )
              Plaintiff,              )    TC-MD 130141D
                                      )
        v.                            )
                                      )
MARION COUNTY ASSESSOR,               )
                                      )
              Defendant.              )    **DECISION**

Plaintiff appeals the Marion County Board of Property Tax Appeals (BOPTA) Orders, dated February 21, 2013, setting the real market value of Plaintiff's 34 separate tax accounts[1] (subject property) for tax year 2012-13. A trial was held on Monday, July 22, 2013, in the Oregon Tax Courtroom, Salem, Oregon. James Poliyanskiy (Poliyanskiy), appeared on behalf of Plaintiff. Robb Witters (Witters), Marion County Appraiser, appeared on behalf of Defendant.

Plaintiff's Exhibit 1 and Defendant's Exhibit A were received without objection.

## I. STATEMENT OF FACTS

The parties agreed that the subject property, identified as Angel's Peak subdivision and located in Turner, Oregon, comprises 34 undeveloped lots ranging in size from 7,500 to 15,565 square feet. (Ptf's Ex 1 at 2; Def's Ex A at 1.) Poliyanskiy testified and Witters agreed that the average buildable area per lot was 8,404 square feet. (Ptf's Ex 1 at 2.) Both parties agreed that without regard to a lot's actual size the real market value of each lot is the same.

Witters' appraisal report described the subject property as "[a] neighborhood[] comprised of primarily single family residences. The area has convenient access to shopping, schools, as

/ / /

---

[1] The 34 account numbers are: R341678, R341680-R341683, R341685, R341687, R341692-R341709, R341711, and R341715-R341722.

well as Interstate 5 and State Highway 22. Turner is a small town located within a few miles of the city of Salem and has a population of approximately 1,850 residents." (Def's Ex A at 1.)

Both parties relied solely on the sales comparison approach to determine the subject property's real market value. Poliyanskiy reviewed his appraisal report, testifying that he identified six comparable properties located in Salem. (*See* Ptf's Ex 1 at 10.) Poliyanskiy testified that he chose the comparable properties based on lot size and proximity to Turner. (*Id*.) Poliyanskiy testified that he adjusted each comparable property's sale price for location, size, topography and view. (*Id*.) Poliyanskiy concluded that the adjusted sale prices of the six comparable properties ranged from $29,000 to $34,000, and stated that if "the outliers" are ignored, the real market value of each lot was $30,000 or the subject property's total real market value was $1,020,000 as of January 1, 2012. (Ptf's Ex 1 at 2.)

Poliyanskiy testified that he was aware some of his comparable sales, Plaintiff's Sale Nos. 1, 2, and 4, were bank-owned properties at the time of sale. (*See* Ptf's Ex 1 at 18, 19, 21.)[2] He concluded that "nothing about any of the sales suggested that the property was sold for less than a competitive price." Poliyanskiy testified that the bank, like the average seller, would be interested in maximizing profits. Poliyanskiy testified that, because each of the comparable properties was listed for sale in the real estate multiple listing service, each property was adequately marketed and each completed sale transaction reflected market value. The parties agreed that Plaintiff's Sale No. 3 was incorrectly listed on Poliyanskiy's report as "level topography." (*See* Ptf's Ex 1 at 10.) Poliyanskiy agreed to a five percent upward adjustment of

/ / /

/ / /

---

[2] The parties clarified at trial that, even though the Plaintiff's Sale No. 2 was not owned by a bank at the time of sale, a bank facilitated the sale because the bank owned the adjacent property. (*See* Ptf's Ex 1 at 19.)

Plaintiff's Sale No. 3 sale price.[3] Poliyanskiy admitted that Plaintiff's Sale No. 5 "occurred between relatives," but stated that he found nothing that suggested the sale was "anything other than arm's-length dealing" because, like all of the sales in his comparable sales analysis, the lot was "exposed to the market." (*See* Ptf's Ex 1 at 22.)

Witters reviewed his appraisal report, testifying that the sale of four comparable properties bracketed the assessment date of January 1, 2012, occurring four months prior and six months after the assessment date. (*See* Def's Ex A at 3). Witters testified that his primary selection criteria for comparable properties was lots located in "similar neighborhoods with similar draws [appeal]." (*Id.*) Witters testified that Salem is a different market than Turner and he did not select any comparable properties from Salem. (*See id.*) Witters testified that Defendant's Comparable Sales Nos. 1, 3 and 4 are located in "south county good neighborhoods, identical to [the] description of [the subject property lots]." Witters testified that Comparable Sale 2 is "actually only south county average" and that it was a bank-owned property at the time of sale, but he included that property to "represent the lower end of the real market value range."

Witters testified that he found no need to adjust the sales for time. (*See* Def's Ex A at 2.) Witters testified that, because the comparable properties are similar in quality and size, and are located in neighborhoods similar to the subject property, no adjustments were made. (*See id.*) Witters testified that he "gave the most weight to Comparable Sales 1 and 3, because Comparable Sale 1 sold close to the assessment date and Comparable Sale 3 was located less than one-half mile from the subject property. Witters testified that the adjusted sales prices of Comparable Sales 1 and 3 support his 2012-13 real market value that each lot was $50,000.

/ / /

---

[3] Poliyanskiy also noted an error with Plaintiff's Sale No. 1, which listed the comparable property as "Salem/Average." (*See* Ptf's Ex 1 at 10.) Poliyanskiy testified that Plaintiff's Sale No. 1 is "Salem/Superior."

In response to questions, Witters acknowledged that Comparable Sale 1 is roughly 4,000 square-feet larger than the average lot in the subject property. (*See* Ptf's Ex 1 at 2, Def's Ex A at 2.) Witters testified that he did not adjust the sale because "the subject property has variably sized lots, and that an adjustment to the comparable sale price for finding the one value of lots of an entire subdivision did not make sense." Poliyanskiy asked Witters whether he was aware that two days after the reported sale of Comparable Sale 3 (a vacant lot), the same lot with an improvement (a single family house) was recorded. Witters responded, stating that he was aware that a "permit for a house" was approved "in December of the same year," but he was not aware that the lot with improvement was recorded two days after Comparable Sale 3 closed.

## II. ANALYSIS

The issue before the court is the 2012-13 real market value of Plaintiff's subject property. Real market value means the

> "amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

ORS 308.205(1)[4] The assessment date for the 2012-13 tax year was January 1, 2012. There are three methods of valuation that are used to determine real market value: 1) the cost approach, 2) the sales comparison or comparable sales approach, and 3) the income approach. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a) (stating that all three approaches must be considered, although all three approaches may not be applicable to the valuation of the subject property). Both parties concluded that the cost approach and the income approach were not appropriate methods to determine the subject property's real market value. Both parties relied on the sales comparison approach. (Ptf's Ex 1 at 10; Def's Ex A at 2.)

---

[4] All references to the Oregon Revised Statutes (ORS) and Oregon Administrative Rules (OAR) are to the year 2011.

Plaintiff bears the burden of proving that the subject property's real market value. ORS 305.427. Plaintiff must establish his claim "by a preponderance of the evidence, or the more convincing or greater weight of evidence." *Schaefer v. Dept. of Rev.*, TC No 4530, WL 914208 at *2 (July 12, 2001) (citing *Feves v. Dept. of Revenue*, 4 OTR 302 (1971)). Evidence that is inconclusive or unpersuasive is insufficient to sustain the burden of proof. *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990)).

A.     *Plaintiff's sales comparison approach*

Poliyanskiy relied on six sales of vacant lots that he concluded were comparable to the subject property's lots. Those adjusted sale prices ranged from $21,300 to $34,236, supporting Plaintiff's determination that the subject property's real market value was $1,020,000. (Ptf's Ex1 at 2,10.)

In a case such as this, the comparable sales approach may be used to value unimproved properties. Appraisal Institute, *The Appraisal of Real Estate* 297 (13th ed 2008). In determining real market value, the court looks for "arm's length sale transactions of property similar in size, quality, age and location" to the subject property in order to reach a correct real market value. *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at * 3 (Mar 26, 2003). "Because the subject property is bare land, size and location [are] key characteristics considered by the court." *Patel v. Marion County Assessor*, TC-MD No 110276D at 7 (Jan 31, 2012).

The legislature requires real market value to be determined in all cases by "methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that: "In utilizing the sales comparison approach only actual market transactions of property

comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

*1. Arm's length transactions*

Many of Plaintiff's comparable properties were bank-owned sales or a sale between related parties. This court has addressed the issue of bank-owned property previously, observing that:

> "A property purchased through foreclosure may well involve an element of compulsion on the part of the seller. There are many practical reasons why the sale of a property following foreclosure by the lender might involve an atypical market condition rendering the transaction of little or no value as an indication of market value. For example, the lender may have a policy of selling such property only for the amount of the underlying debt, regardless of what the property may actually be worth, particularly if it would take a few months more to find a buyer willing to pay a higher price. If so, the sale, at best, likely represents the low end of the real market value range, and may have been well below the actual market value of the property."

*Kryl v. Lane County Assessor* (*Kryl*), TC-MD No 100192B, WL 1197444 at *2 (Mar 30, 2011). In *Kryl*, this court gave little weight to a bank-owned property sale that occurred within a few months after the bank acquired it and after a short listing period. This court has also observed that "a sale of bank-owned property conducted with such rapidity suggests duress or compulsion on the part of the seller, leading the court to conclude such sales are not indicative of an arm's-length transaction." *Brashnyk v. Lane County Assessor (Brashnyk)*, TC MD 110308, WL 6182028 at *5 (Dec 12, 2011).

This court has also held that "[t]here are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk*, WL 6182028 at *5. Bank-owned property sales may be considered as comparable sales for the purpose of establishing real market value "when those bank-owned

property sales have been exposed to the open market and meet the nominal standards for an acceptable comparable sale." *Brashnyk*, WL 6182028 at \*6 (internal quotation marks omitted).

The length of time a property was listed for sale and owned by a bank are important in determining arm's length transactions of bank-owned sales. *See Brashnyk*, WL 6182028 at \*5 (stating that "the court gave little weight to a bank-owned property sale in which the bank sold the property within a few months after acquiring it and after a short listing period."). Poliyanskiy testified that all comparable properties were listed for sale on a real estate multiple listing service. The issue is whether Plaintiff's three comparable sales (Sales Nos. 1, 2 and 4) that were owned by banks were adequately exposed to the open market. When asked how long the bank-owned properties were owned by the bank and listed for sale, Poliyanskiy stated that he did not know.

Transactions between related parties warrant greater scrutiny to ensure that each party is a knowledgeable and willing buyer or seller. Plaintiff's Sale No. 5 was a transaction between related parties. There is no evidence that Sale No. 5 was between a knowledgeable and willing buyer and seller. Like the bank-owned comparable properties, Poliyanskiy argued that Sale No. 5 was adequately exposed to the market through a multiple listing service. Like the bank-owned comparable properties, Poliyanskiy provided no evidence as to the length of time the property was listed for sale.

There is no evidence that Plaintiff's Sale Nos. 1, 2, 4, and 5 were arm's length transactions. Plaintiff's two remaining comparable properties, Sale Nos. 3 and 6, are discussed in the following section, *Adjustments*.

Poliyanskiy alleged that the majority of sales closing during the assessment period were bank-owned or distressed sales. He argued that because every sale had the same pressures of a

distressed sale, those distressed sales were the market's standard and evidence of real market value. This court concluded that in certain circumstances an exception may be recognized "where the majority of sales are distress[ed], [for] it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985). In the case before the court, Plaintiff presented no evidence to support his conclusion that the majority of sales during the 2012-13 tax year were sales of bank-owned or distressed properties. The court finds no evidence to support a conclusion that warrants the requested exception.

2.     *Adjustments*

In determining real market value, "[t]axpayers must provide competent evidence of the [real market value] of their property." *Poddar v. Dept. of Rev.*, 18 OTR 324, 332 (2005) (quoting *Woods v. Dept. of Rev.*, 16 OTR 56, 59 (2002) (citation omitted)). "Competent evidence includes appraisal reports and sales adjusted for time, location, size, quality, and other distinguishing differences, and testimony from licensed professionals such as appraisers, real estate agents, and licensed brokers." *Danielson v. Multnomah County Assessor*, TC-MD No 110300D at 7 (Mar 13, 2012).

Poliyanskiy testified that he adjusted each comparable property's sale price for location, size, topography and view. (Ptf's Ex 1 at 10.) Poliyanskiy testified that his six comparable properties are located in Salem. Poliyanskiy testified that he chose Salem lots because he wanted to filter sales primarily based on size, and found none comparable in Turner. He determined that Salem had the closest comparable properties. Poliyanskiy stated in his closing statement that location is the most important factor to the value of a lot. Poliyanskiy did not explain why he emphasized lot size over location in choosing comparable sales. It is unclear to the court why

Poliyanskiy chose to focus on lot size over location for a comparable property contrary to his stated preference for location.

Poliyanskiy's analysis of his comparable lots included applicable adjustments for lot size, topography and view. (Ptf's Ex 1 at 10.) The adjustments ranged from two to 15 percent. Poliyanskiy's report and testimony failed to explain the basis for the percentage adjustments. Poliyanskiy failed to state his professional qualifications in his report and testimony.

The court concludes that Plaintiff's comparable approach is incomplete. The court gives little weight to Plaintiff's report and determination of the subject property's real market value. Plaintiff failed to carry its burden of proof.

B.      *Defendant's comparable sales*

Even though the burden has not shifted under ORS 305.427, "the court has jurisdiction to determine the real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. The court now turns to Defendant's evidence to determine the real market value of the subject property.

Witters, a certified appraiser since 2008, selected four comparable properties. The adjusted sale prices ranged from $35,000 to $50,500. (Def's Ex A at 2 and 8.) Witters' Comparable Sale 2 was a bank-owned property at the time of sale, and lower quality than the subject property. The sale of a bank-owned property can be an indicator of real market value if it meets qualifying requirements. *See Brashnyk*, WL 6182028 at *5. Defendant's evidence gave no indication that Comparable Sale 2 met the qualifying requirements as an indicator of real market value for the subject property. The court gives no weight to Comparable Sale 2.

/ / /

/ / /

When considering a comparable sales analysis, the court has stated that

"[i]n evaluating the competing evidence, the court looks to the comparability of different sales and the application of all necessary adjustments for differences. Adjustments are a key component in evaluating properties."

*Voronaeff v. Crook County Assessor*, TC-MD No 110361C at 6 (Apr 25, 2012). According to

*The Appraisal of Real Estate*:

"[i]deally, if all comparable properties are identical to the subject property, no adjustments will be required. However, this is rarely the case * * *. After researching and verifying transactional data and selecting the appropriate unit of comparison, the appraiser adjusts for any differences."

Appraisal Institute, *The Appraisal of Real Estate* 307 (13th ed 2008). Witters made no adjustments to any of the sale prices of the four comparable properties. Witters testified that he selected comparable properties based primarily on similar markets to the subject property so that each sale would not require a location adjustment. He testified that size adjustments were unnecessary given the diversity of the lots in the subject property and that each comparable property was similar to at least one of the lots in the subject property. (*See* Def's Ex A at 2; Ptf's Ex 1 at 2.)

Both parties agreed that the average buildable area of the subject property was 8,404 square feet. (*See* Ptf's Ex 1 at 2.) Witters testified that the buildable area of Comparable Sales 1, 3, and 4 exceeded the subject property's buildable area, averaging 11,942 square feet (rounded) for each of the three properties. (*See* Def's Ex A at 2.) The difference between Witters' comparable properties' average buildable area and the subject property's average buildable area is approximately 3,500 square feet. Given the substantial difference in buildable area, it is unclear why Witters failed to make a size adjustment.

Even though Witters' comparable sales are not adjusted, the price per square foot of Witters' comparables suggests a real market value closer to Plaintiff's requested value than

Defendant's requested value. Comparable Sales 1, 3, and 4 gives a price per square foot range of $3.98 to $4.61. The court notes that Witters' report indicates a value range closer to Plaintiff's requested $3.57 per square foot than Defendant's $5.95 per square foot, but the evidence presented is inconclusive. (*See* Ptf's Ex 1 at 2; Def's Ex A at 7.) Witters' report does not include appropriate adjustments to make the sales adequately comparable to the subject property. The court cannot determine the 2012-13 real market value based on the testimony and evidence.

### III. CONCLUSION

After careful consideration of the testimony and evidence, the court concludes that Plaintiff failed to carry its burden of proof. The court further finds that the value evidence presented was inconclusive and the court cannot determine the 2012-13 real market value of the subject property. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ___ day of September 2013.

JILL A. TANNER
PRESIDING MAGISTRATE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within <u>60</u> days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This Decision was signed by Presiding Magistrate Jill A. Tanner on September 4, 2013. The court filed and entered this Decision on September 4, 2013.*